IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROMISE PUBLIC SCHOOLS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>SAN JOSE UNIFIED SCHOOL DISTRICT, et al.,<br><br>    Defendants. | Case No. 20-cv-08555-CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |

Promise Public Schools (Promise) has sued the San Jose Unified School District (SJUSD), SJUSD Superintendent Nancy Albarran, SJUSD Deputy Superintendent Stephen McMahon, and various Doe Defendants for violations of Promise's constitutional rights under 42 U.S.C. § 1983 and for violations of California law. Defendants have moved to dismiss the case for failure to state a claim. The Court grants in part and denies in part Defendants' motion to dismiss. Promise's § 1983 claims are dismissed with leave to amend.

**I.    BACKGROUND**

   **A.    The Parties**

Promise is a California non-profit public benefit corporation formed with "the purpose of operating high performing public charter schools serving disadvantaged students." Amend. Compl. (dkt. 9) ¶ 1. SJUSD is a public school district operating in the County of Santa Clara. Id. ¶ 2. Defendant Nancy Albarran is SJUSD's Superintendent, and Defendant Stephen McMahon is Deputy Superintendent. Id. ¶¶ 3–4.

**B.     Proposition 39**

Proposition 39 requires California public school districts to furnish any charter school with "facilities sufficient to accommodate all of the charter school's in-district students in conditions reasonably equivalent to those in which the students would be accommodated if they were attending the other public schools of the district." Cal. Educ. Code § 47614(b).  But districts must share facilities only if projected in-district Average Daily Attendance (ADA) at the charter school exceeds 80 students.  Id. § 47614(b)(4). "[A] student attending a charter school is an 'in-district student' of a school district if he or she is entitled to attend the schools of the school district and could attend a school district-operated school" if the student did not attend the charter school.  Cal. Code Regs. Tit. 5, § 11969.2(c).

The deadline for submitting a request for facilities to a school district is November 1 of the year preceding the school year in which the facilities will be used (e.g., November 1, 2017 for the 2018–2019 school year).  Id. § 11969.9(b).  On or before December 1, the school district must "review the charter school's projections of in-district and total ADA and . . . express any objections in writing and state the projections the district considers reasonable."  Id. § 11969.9(d).  "On or before February 1, the school district shall prepare in writing a preliminary proposal regarding the space to be allocated to the charter school and/or to which the charter school is to be provided access."  Id. § 11969.9(f).  The charter school can respond to the preliminary proposal and make any counterproposals no later than March 1.  Id. § 11969.9(g).  By April 1, "having reviewed any concerns and/or counter proposals made by the charter school," the school district must make a final offer. Id. § 11969.9(h).  The charter school has thirty days or until May 1, whichever is later, to "notify the school district in writing whether or not it intends to occupy the offered space." Id. § 11969.9(i).

If the charter school notifies the district that it intends to occupy the space, that triggers certain obligations for both the charter school and the school district.  As relevant here, first, "the charter school is committed to paying the pro rata share amount as

identified" in the final offer.  Id. § 11969.9(i).  That amount reflects how much the school district will "charge the charter school . . . based on a ratio of space allocated by the school district to the charter school divided by the total space of the district."  Cal. Educ. Code § 47614(b)(1).  In other words, the charter school must pay its share of "district facilities costs," but "shall not be otherwise charged for the use of facilities."  Id.  Second, the district and the charter school "shall negotiate an [additional] agreement regarding use of and payment for the space," and that agreement "shall contain at a minimum . . . the information included" in the final offer.  Cal. Code Regs. Tit. 5, § 11969.9(k).  Third, the school district must have the agreed upon facilities ready for the charter school's use at least ten days prior to the start of school.  Id. § 11969.9(j).

### C. Promise's Search for Facilities for the 2018–2019 School Year

In April 2017, Promise applied to SJUSD to create a K-12 charter school in San Jose.  Id. ¶ 20.  During the application review process, SJUSD conducted a telephone survey to gauge interest in the community for Promise's charter school ("First Telephone Survey").  Amend. Compl. Exh. 1 at 31.  Finding a lack of meaningful interest, SJUSD rejected Promise's application.  Id.; Amend. Compl. ¶ 20.  Promise alleges that this was the result of a "strong anti-charter contingent" that had "come to dominate District management."  Amend. Compl. ¶ 19.  Promise appealed SJUSD's decision to the County Board of Education, and then the State Board of Education.  Id. ¶ 21.  On January 19, 2018, the State Board unanimously approved Promise's charter for the 2018–2019 school year.  Id.; Amend. Compl. Exh. 1 at 30.  The approval was contingent on Promise providing the State Board with proof that it had found adequate school facilities for the 2018–2019 school year by June 15, 2018.  Amend. Compl. Exh. 1 at 30.[1]

While the State Board was considering Promise's (ultimately successful) appeal, on October 31, 2017, Promise submitted a Proposition 39 request for facilities to SJUSD,

---

[1] SJUSD filed a writ of mandate petition against the State Board of Education in state court, arguing that the Board had abused its discretion in approving the charter petition.  Amend. Compl. ¶ 23.  The state court denied SJUSD's petition on June 29, 2018.  Id.

supported by 318 "intent to enroll" forms.  Amend. Compl. ¶ 25; Amend. Compl. Exh. 1 at 30–31.  From these "intent to enroll" forms, Promise projected a total enrollment of 210 students and an in-district ADA of 193.6.  Amend. Compl. ¶ 25.  On November 30, 2017, SJUSD informed Promise that Promise was ineligible for Proposition 39 facilities based on SJUSD's own ADA projections.  Amend. Compl. Exh. 1 at 31–32.  SJUSD had eliminated duplicate intent to enroll forms, removed submissions of parents who SJUSD had determined were not interested through the First Telephone Survey, and applied a projected non-enrollment rate to the remaining forms.  Id.[2]

On December 31, 2017, Promise sent a letter reaffirming its own projection.  Id. at 32.  Roughly one week after the State Board approved Promise's charter in January 2018, Albarran and McMahon set up a second telephone survey to "verify" whether the parents who signed the intent to enroll forms would actually enroll their children in Promise if it opened.  Amend. Compl. ¶ 26.  Promise alleges that as a result of these "coercive" calls, Defendants could verify less than 80 in-district students who would attend Promise, and that Defendants used this as a basis to deny Promise facilities.  Id. ¶¶ 26, 27.

Promise filed a writ of mandate petition in California Superior Court contesting SJUSD's refusal to offer facilities.  Id. ¶ 29.  On June 14, 2018, the Superior Court ruled that SJUSD had exceeded its statutory authority to conduct only a "limited" review of Promise's estimate and ordered SJUSD to make a preliminary offer of facilities for the 2018–2019 school year.  Amend. Compl. Exh. 1 at 34–36, 41.

At the end of June 2018, SJUSD offered Promise facilities that Promise alleges were "many" miles from the downtown San Jose area that it was hoping to serve.  Amend. Compl. ¶ 30; Amend. Compl. Exh. 1. at 41.  Promise alleges that getting to the proposed location would have required many students to ride to school either on freeways or for hours on public transportation, and that most students' families would not have cars.  Amend. Compl. ¶ 30.  And Promise alleges that, because the offer came so late in the year,

---

[2] The rejection rate was based on results from the First Telephone Survey.  Amend. Compl. Exh. 1 at 31–32.

4

Promise was unable to secure needed transportation resources and could not accept the offer. Id.

### D. Promise's Search for Facilities for the 2019–2020 School Year

#### 1. The Initial Request

In fall 2018, Promise submitted a request for facilities for the 2019–2020 school year. Id. ¶ 32. Promise projected an ADA of 197.4, supported by 160 "intent to enroll" forms. Id. Promise alleges that SJUSD staff, including Albarran and McMahon, subjected Promise's request "to requirements that no other charter school was required to meet, and then used those requirements as a new basis for rejecting the forms." Id. ¶ 33. "For example, the Defendants rejected any intent to enroll forms for TK [Transitional Kindergarten] students that did not specifically state the child's existing grade, believing that a mere intent to enroll in the lowest level grade possible was not sufficient if the parent did not list a cell phone number." Id. In practice, this meant that SJUSD rejected intent to enroll forms that listed the student's current grade as "pre-school" and provided no information on expected grade level for the upcoming school year. RFN (dkt. 19-2) at 233–34. As a result, SJUSD verified an in-district ADA of just 68 students. Amend. Compl. Exh. 2 at 44. Promise sued over SJUSD's methodology, but a Superior Court judge largely approved SJUSD's approach. See RFN at 241–42. Thus, SJUSD could deny Promise's facilities request. See Cal. Educ. Code § 47614(b)(4).

#### 2. SJUSD's Offer

Rather than deny Promise's request outright, SJUSD voluntarily sent Promise a final offer of facilities ("Final Offer"). Amend. Compl. ¶ 35; Amend. Compl. Exh. 2 at 44. SJUSD noted that it was "not obligated to provide an offer of facilities," but nonetheless "elect[ed] to provide a voluntary Final Offer . . . consistent with the Prop 39 process." Amend. Compl. Exh. 2 at 44. The Final Offer would provide Promise facilities based on the 193.6 total ADA figure from its 2018–2019 request, but with an assumed in-district ADA of 68. Id. In addition to charging Promise a "pro-rata" share of facilities "maintenance costs in the annual amount of $192,037" based on SJUSD's in-district ADA

5

projection, SJUSD would also charge Promise a $249,782.08 "fair market value use fee . . . for out-of-district students." Id. at 50–51.

The Final Offer cited Proposition 39's requirement that Promise notify SJUSD whether it intended to occupy the offered space by May 1. Id. at 54 (citing Cal. Code Regs. Tit. 5, § 11969.9(i)). The Final Offer also referenced Proposition 39's requirement that the parties "negotiate an agreement regarding use of and payment for the space." Cal. Code Regs. Tit. 5, § 11969.9(k); see Amend. Compl. Exh. 2 at 54. The Final Offer stated that if Promise accepted the Final Offer, SJUSD would "require it to enter into a Facilities Use Agreement [FUA] containing the terms and conditions of the District's facilities allocation." Amend. Compl. Exh. 2 at 54. SJUSD provided a proposed FUA "without prejudice to its right to propose or modify terms during the process of negotiating" the FUA. Id.

### 3.     The FUA Negotiation Period

On April 29, 2019, Promise sent SJUSD a letter stating that Promise "accepts and intends to occupy the offered space." McMahon Decl. (dkt. 19-1) at 3. But Promise did so "without acknowledging" the Final Offer's "sufficiency under applicable local, state, or federal law and without waiving any of its legal rights under applicable local, state, or federal law, including Proposition 39 rights and remedies." Id. Promise reiterated its objections to the terms of the Final Offer, including the calculation of in-district ADA and the resulting facility fees. See id. at 2–27. In addition, Promise proposed a settlement regarding the disputed sufficiency of the Final Offer under Proposition 39. Id. at 4. The letter concluded by stating that Promise's "failure to mention a concern in this letter should not be interpreted as acceptance of that term." Id.

Along with its response, Promise submitted a counterproposal to SJUSD's proposed FUA—the additional agreement that Proposition 39 requires a district and a school to "negotiate." Id. at 3–4; see Cal. Code Regs. Tit. 5, § 11969.9(k). The counterproposal contained several changes, the bulk of which focused on reducing the pro rata share of fees Promise owed to SJUSD. McMahon Decl. at 7. Promise alleges that SJUSD did not

respond to this counterproposal. Amend. Compl. ¶ 41.

On July 15, 2019, Promise sent McMahon an email:

> We'd like to thank you and your team for meeting with us this past week. As we understand your position, the district will only accept the signed original final offer and Facilities Use Agreement [FUA] . . . Additionally, upon receiving the requested signed FUA, the district commits to having Promise's classroom space furnished and ready minimally (10) days prior to our first day of school which is August 12th.

McMahon Decl. at 29.[3]

A letter from Promise's attorney accompanied the email. See id. at 60.[4] The letter stated that although Promise was continuing to dispute SJUSD's calculation of its "'fair market value' charge for out-of-district students pursuant to . . . Proposition 39," Promise had to "occupy the District's facilities as soon as practicable." Id. Promise requested various changes to the FUA so that Promise could "afford to accommodate its planned enrollment." Id. In particular, Promise crossed out some of the teaching stations assigned to it in exhibits of the attached FUA, thereby reducing its assigned square footage and facility fee. See McMahon Decl. at 57. Promise alleges that SJUSD did not respond. See Amend. Compl. ¶ 41.

On July 30, 2019, Promise signed SJUSD's original FUA proposal, but failed to include any of the proposal's original exhibits detailing the allocation of facility square footage that formed the basis of the facility fee; as such, it was unclear to what Promise was agreeing. Id. ¶ 42; see McMahon Dec. at 68–89. In an accompanying letter, Promise's attorney reiterated Promise's understanding that "the District has agreed to provide access to the facilities ten (10) days prior to August 12, 2019, assuming that Promise Academy signs the proposed Facilities Use Agreement." McMahon Dec. at 86. On August 5, 2019—seven days before August 12, 2019—Promise re-sent the signed FUA

---

[3] The email purported to attach the signed, original FUA, see McMahon Decl. at 29, though Promise's Complaint characterizes its July 15 communication as a revised counteroffer containing "fewer modifications" than before, Amend. Compl. ¶ 41.

[4] The letter is dated July 11, 2019, see McMahon Decl. at 60, but it accompanied Promise's email response with the FUA on July 15, 2019, see id. at 29.

7

with all exhibits attached.  Amend. Compl. ¶ 43.

SJUSD responded that because Promise had not properly signed the FUA by August 2, 2019, ten days before the opening of school, the facilities had been reassigned and were no longer available.  Id.

Promise alleges that SJUSD failed to inform Promise that Promise would not be able to use the facilities if the FUA was not completed by August 2, 2019.  Id. ¶ 44. Promise further alleges that "[n]o other charter schools operating within the District have been subject to the requirement that an FUA must be executed no later than ten days before the opening of the school, and that the failure to do so would result in a forfeiture of the charter school's entitlement to use the space that had been offered to it."  Id. ¶ 45.  Promise alleges that Albarran's and McMahon's animus towards Promise led to these requirements, which were part of a concerted effort to "prevent Promise from being able to open a charter school in accordance with the terms of its charter."  Id.

### E. Procedural History

After submitting a government claim to SJUSD in compliance with the California Government Claims Act, Cal. Gov't Code § 810, which SJUSD denied, Amend. Compl. ¶ 48, Promise sued Defendants in the Superior Court of the State of California for Santa Clara County on September 18, 2020.  Notice of Removal (dkt. 1) ¶ 1.  On December 3, 2020, Defendants removed the case to this Court.  See generally id.

Promise asserts eight causes of action: two Fourteenth Amendment claims (one based on equal protection and one based on due process) under 42 U.S.C. § 1983 against Albarran and McMahon; a promissory fraud claim against Albarran and McMahon; breach of contract, breach of the covenant of good faith and fair dealing, and breach of statutory duty claims against SJUSD; and a tortious interference with contract claim against all Defendants.  See generally Amend. Compl.  The Court has federal question jurisdiction over Promise's § 1983 claims, see 28 U.S.C. § 1331, and can exercise supplemental jurisdiction over the related state law claims, see 28 U.S.C. § 1367.  Defendants have moved to dismiss all claims.  See generally MTD.

8

## II. LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim for which relief may be granted. See Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When evaluating a Rule 12(b)(6) motion, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). But conclusory allegations amounting only to "formulaic recitation of the elements" are not entitled to an assumption of truth. See Iqbal, 556 U.S. at 681 (quoting Twombly, 550 U.S. at 555). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

When dismissal is appropriate, courts "shall freely" give leave to amend the complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). In the Ninth Circuit, district courts may deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (quoting Foman v. Davis, 31 U.S. 178, 182 (1962)).

## III. DISCUSSION

Defendants argue that the Court should dismiss Promise's § 1983 claims because Promise lacks standing to bring the claims, the claims fail on the merits, and Defendants Albarran and McMahon are protected by qualified immunity. Defendants argue that the

9

1  Court should dismiss Promise's California claims because there was no valid contract
2  between Promise and SJUSD, there was no misrepresentation by Albarran or McMahon,
3  and there was no breach of statutory duty by SJUSD.  Because Promise has not adequately
4  pleaded any equal protection or due process violations, the Court grants Defendants'
5  motion to dismiss to the extent it seeks dismissal of Promise's § 1983 claims.  The Court
6  denies the motion with respect to Promise's California claims.[5]

**A.   Fourteenth Amendment § 1983 Claims Against Albarran and McMahon**

42 U.S.C. § 1983 creates a private right of action against any individual who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution."

Promise brings two § 1983 claims asserting underlying Fourteenth Amendment violations against Albarran and McMahon in their individual capacities: (1) a "class of one" claim under the Equal Protection Clause based on Albarran and McMahon's alleged differential treatment of Promise, and (2) a due process claim based on Albarran and

---

[5] Defendants have requested that the Court notice (1) a document that SJUSD filed in California Superior Court demonstrating the steps that SJUSD took to comply with the state court's order to provide Promise facilities for the 2018–2019 school year, and (2) the state court order denying Promise's challenge to SJUSD's methodology for establishing in-district ADA for the 2019–2020 school year. See generally RFN (dkt. 19-2). Although Promise references both documents in its Complaint, see Amend. Compl. ¶¶ 30, 33, the Court denies SJUSD's request for judicial notice with respect to (1) SJUSD's filing in Superior Court, the accuracy of which could reasonably be questioned, and grants SJUSD's request for judicial notice with respect to (2) the Superior Court order, the accuracy of which cannot be reasonably questioned.  See Fed. R. Civ. P. 201(c)(2).

Defendants have also attached a declaration including four exhibits comprising email negotiations regarding the FUA, for incorporation by reference. See generally McMahon Decl.  The Court incorporates these exhibits by reference into the Complaint.  First, Promise's claims depend on the contents of these documents.  See Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005). Throughout its Complaint, Promise alleges that it 'accepted' the March 29, 2019 Final Offer and 'entered into a valid contract,' see, e.g., Amend. Compl. ¶¶ 37, 39, 50, and references the specific emails that Defendants have attached in doing so, see id. ¶¶ 40, 41.  Second, the parties do "not dispute the authenticity of the document[s]." Knievel, 393 F.3d at 1076.  Although Promise objects to their "lack of authentication under Federal Rule of Evidence 901(a)," McMahon Decl. Obj. (dkt. 24-2) at 2–3, Promise's argument that the exhibits have not gone through a particular authentication process does not constitute a challenge to their underlying authenticity.  See Fed. R. Evid. 901(a).  In any event, McMahon's declaration under the penalty of perjury would satisfy Rule 901.  See Fed. R. Evid. 901(b)(1).

McMahon's denial of Promise's purported property interests in the right to operate a charter school and the right to use SJUSD facilities. Amend. Compl. ¶¶ 58–60, 67. Because Promise fails to state a claim for which relief may be granted under § 1983, the Court grants the motion to dismiss these claims with leave to amend.

### 1. Standing

"The doctrine of standing limits federal judicial power." Or. Advocacy Ctr. v. Mink, 322 F.3d 1101, 1108 (9th Cir. 2003). Thus, plaintiffs must have standing to be "entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). To have standing, plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).

Some entities categorically lack standing to bring constitutional claims against certain government actors. For example, "a political subdivision, 'created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator.'" Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353, 363 (2009) (quoting Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 40 (1933)).

Here, Albarran and McMahon do not dispute that Promise has suffered an injury (its failure to open a school and resulting harm) fairly traceable to their conduct (their refusal to let Promise occupy facilities) that is likely to be redressed by a favorable decision. Instead, they argue that Promise, as a charter school and thus an "arm of the state," lacks standing to bring its constitutional claims. MTD at 18.

This argument fails. Even assuming that the doctrine foreclosing a political subdivision from invoking the Constitution "in opposition to the will of its creator" would bar Promise from suing SJUSD under § 1983, see Ysura, 555 U.S. at 363, it would not bar Promise from suing Albarran and McMahon in their individual capacities. Such employees are not, in any relevant sense, Promise's "creator." Id. Because Promise

11

1    asserts these constitutional claims against only Albarran and McMahon as individuals, the
2    doctrine is inapplicable. The Court thus addresses the merits of Promise's § 1983 claims.
3    See Warth, 422 U.S. at 498.

### 2.   Equal Protection Claim

Under the Fourteenth Amendment, "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. Typically, claims under the Equal Protection Clause challenge "governmental classifications that 'affect some groups of citizens differently than others.'" Engquist v. Oregon Dep't of Agr., 553 U.S. 591, 601 (2008) (quoting McGowan v. Maryland, 366 U.S. 420, 425 (1961)). But a "class of one" may bring an equal protection claim by alleging that the plaintiff "has been [1] intentionally [2] treated differently from others similarly situated and that [3] there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); see also Gerhart v. Lake Cnty., Mont., 637 F.3d 1013, 1022 (9th Cir. 2011) (reiterating these elements). In short, "when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a 'rational basis for the difference in treatment.'" Engquist, 553 U.S. at 602 (quoting Olech, 528 U.S. at 564).

#### a.   Intentionality

Here, there is no dispute that Albarran and McMahon acted intentionally. See Opp. (dkt. 24) at 11; Reply (dkt. 25) at 9.

#### b.   Disparate Treatment

Promise alleges that Albarran and McMahon subjected Promise to disparate treatment in three ways:

> (1) the requirement that families signing intent to enroll forms for students of TK [Transitional Kindergarten] age would not be counted towards a school's projected in-district ADA, unless the student's intended grade is specified; (2) the level of scrutiny the District imposed on Promise's Proposition 39 requests for facilities which was far more stringent than other charter schools; and (3) the uncommunicated requirement that Promise complete an FUA within a specified period of time or forfeit its entitlement to the facilities the District had previously been offered.

12

Amend. Compl. ¶ 61.

To determine whether a defendant's treatment of a plaintiff deviated from the treatment given to similarly situated entities, courts examine "usual procedure" or past practice. Gerhardt, 637 F.3d at 1022. For example, Gerhardt held that there had been disparate treatment when "ten other property owners" on the plaintiff's block had not been required to apply for permits when they built approaches to a road, but the plaintiff had been required to apply for a permit to do the same. Id. Similarly, in Squaw Valley Dev. Co. v. Goldberg, the defendants conceded that they had subjected the plaintiff to "more oversight" and "more formal regulatory and enforcement action" than "other similarly-situated" persons. 375 F.3d 936, 944 (9th Cir. 2004), overruled on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005).

Even when there is some technical basis for concluding that differential treatment has occurred, not all disparate treatment gives rise to a claim. "[T]he existence of a clear standard against which departures, even for a single plaintiff, [can] be readily assessed" is a crucial component of a "class of one" claim. Engquist, 553 U.S. at 602. Thus, when the relevant conduct "involve[s] discretionary decisionmaking based on a vast array of subjective, individualized assessments[,] . . . the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others." Id. at 603. In those situations, "treating like individuals differently is an accepted consequence of the discretion granted." Id. For example, "employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." Id. at 604. A police officer's decision to ticket some drivers, but not others engaging in substantially the same conduct, also involves discretion that is not susceptible to a class of one challenge. See id.

Under this standard, Promise has failed to plausibly allege disparate treatment.

First, Promise's claim that SJUSD treated it differently by discounting the intent to enroll forms of Transitional Kindergarten and Kindergarten students with no specific grade listed fails. Promise's conclusory allegation that no other charter schools were subject to

13

1    this requirement lacks adequate detail: Promise has not identified a single "similarly-
2    situated" charter school for which SJUSD accepted "intent to enroll" forms for
3    Transitional Kindergarten and Kindergarten students with no current or intended grade
4    listed.  See Squaw Valley, 375 F.3d at 944.  Based on Promise's allegations, it is plausible
5    that SJUSD has not had to impose such a requirement because other charter schools
6    submitted forms that contained the information that Promise omitted.  Moreover, SJUSD's
7    decision to require that information is also the sort of subjective discretionary judgment
8    that is not amenable to a class of one challenge.  See Engquist, 553 U.S. at 603–04.
9    California administrative regulations require that students entering Kindergarten and
10   Transitional Kindergarten fall into certain age groups.  See Cal. Educ. Code § 48000(a).
11   The means a district employs to determine whether a charter school's projected enrollment
12   is consistent with those regulations—whether through intent to enroll form requirements or
13   other methods—may change with the circumstances.  Thus, Promise could not allege that
14   SJUSD selectively imposed the regulatory age group requirements, and SJUSD's use of
15   specific means to determine Promise's compliance with those requirements involves the
16   sort of discretion against which departures in treatment cannot be readily assessed.  See
17   Engquist, 553 U.S. at 602.[6]

18       Second, Promise's claim that Albarran and McMahon applied "far more stringent"
19   scrutiny to Promise's request for facilities also fails.  This broad allegation is devoid of any
20   detail and does nothing more than restate the basic premise of Promise's cause of action.
21   And once again, Promise provides no concrete allegations regarding the treatment of other
22   similarly situated charter schools.  See Squaw Valley, 375 F.3d at 944.

23       Finally, Promise's claim that SJUSD imposed an uncommunicated deadline for
24   signing the FUA that SJUSD did not impose on other charter schools fails.  Promise's
25   failure to identify any specific "similarly-situated" charter school that was not subject to

---

[6] For the same reason, SJUSD had a rational basis for requiring these students to list their current and intended grades.  As the Superior Court acknowledged, without this information, SJUSD could not easily determine whether these students were legally eligible to enroll.  See RFN at 234.

such a deadline is fatal to Promise's claim. See id. As with the intent-to-enroll form requirements, Promise's allegations leave open the possibility that SJUSD simply had not encountered a similar situation before, such that its decision to impose the deadline did not subject Promise to unequal treatment.

Indeed, as to each purported example of disparate treatment, it is not enough for Promise to simply allege that "all charter schools using District facilities" were similarly situated. See Opp. at 11. If other charter schools never submitted intent to enroll forms with intended grades missing, or never engaged in FUA negotiations that could have implicated the sort of deadline imposed by the school, then they were not similarly situated in the relevant sense. Even if other schools did submit intent to enroll forms with intended grades missing, or engaged in FUA negotiations that could implicate such a deadline, other factors might indicate that Promise was not similarly situated to those schools. Whether or not disparate treatment has occurred is impossible to glean from the complaint in its current form.

### c. Rational Basis

"Disparate government treatment will survive rational basis scrutiny 'as long as it bears a rational relation to a legitimate state interest.'" Squaw Valley, 375 F.3d at 944 (quoting Patel v. Penman, 103 F.3d 868, 875 (9th Cir.1996)). "Although selective enforcement of valid laws, without more, does not make the defendants' action irrational, there is no rational basis for state action that is malicious, irrational or plainly arbitrary." Id. (internal citations and quotations omitted). In a "class of one" claim, the focus of the rational basis inquiry "turns on whether there is a rational basis for the distinction, rather than the underlying government action." Gerhart, 637 F.3d at 1023 (emphasis in original). In the Ninth Circuit, a party may pursue an equal protection claim by plausibly alleging that a defendant's asserted rational basis was a pretext for differential treatment. Squaw Valley, 375 F.3d at 945–46.

Here, even assuming disparate treatment, Promise has failed to plausibly allege that the treatment lacked a rational basis for two reasons. First, Promise's allegations of

15

animus lack particularity.  Promise alleges that Albarran and McMahon's "personal animus and dislike of Promise" led them to impose stricter requirements on Promise than on other charter schools, and that SJUSD had a "strong anti-charter contingent."  Amend. Compl. ¶¶ 19, 62.  But Promise has provided no basis to conclude that Albarran and McMahon were motivated by personal animus beyond these conclusory statements.  Second, Promise's theory of animus cannot explain the "<u>distinction</u>" that Albarran and McMahon allegedly applied to Promise vis-à-vis other charter schools.  <u>Gerhart</u>, 637 F.3d at 1023 (emphasis in original).  Here, the relevant distinction is between Promise and other charter schools.  Promise's allegation that SJUSD leadership dislikes charter schools does not explain why Albarran and McMahon would impose more onerous requirements on Promise than on other charter schools.

Because Promise has failed to allege with enough detail that it was subject to disparate treatment relative to other similarly situated charter schools, or that any disparate treatment was motivated by animus, the Court grants Defendants' motion to the extent it asks the Court to dismiss Promise's equal protection § 1983 claim.  The Court gives Promise leave to amend its complaint to add details regarding SJUSD's treatment of other charter schools, whether those schools were similarly situated to Promise, and why the differential treatment occurred.

### 3. Due Process Claim

In its second § 1983 claim, Promise alleges that Albarran and McMahon violated the Fourteenth Amendment by denying Promise (1) its "protected property interest in the right to operate a charter school," that is, Promise's interest in its charter, and (2) Promise's protected property interest in the right to use SJUSD facilities, "without affording Promise adequate due process of law."  Amend. Compl. ¶ 67; Opp. at 13.  The Fourteenth Amendment states that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV.  To adequately plead a procedural due process violation, a plaintiff must demonstrate two elements: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of

16

adequate procedural protections." Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 982 (9th Cir. 1998).

In some instances, a government contract can give rise to a property right protected by the Due Process Clause. "[I]t has long been settled that a contract" with the government "can create a constitutionally protected property interest." San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty., 825 F.2d 1404, 1407–08 (9th Cir. 1987). But because "the Fourteenth Amendment was not intended to shift the whole of the public law of the states into the federal courts," id. at 1408 (quoting Brown v. Brienen, 722 F.2d 360, 364 (7th Cir.1983)), the Ninth Circuit has differentiated between "mere contract rights and constitutionally protected property rights created by contract," DeBoer v. Pennington, 206 F.3d 857, 869 (9th Cir. 2000) (internal quotation marks and alterations omitted), judgment vacated on other grounds sub nom. City of Bellingham v. DeBoer, 532 U.S. 992 (2001). In doing so, the Ninth Circuit has recognized two limited scenarios where public contracts may create protected property interests: first, "where the contract confers a protected status due to extreme dependence, as is the case with welfare benefits, or permanence, as is the case with tenure," and second, "where the contract itself contains a provision that the governmental entity can terminate the contract only for cause." Id.

Here, Promise fails to state a claim for a due process violation against Albarran and McMahon based on Promise's lost charter. Even assuming that Promise had a protected property interest in its charter, Albarran and McMahon had no power to revoke or renew Promise's charter. That power belonged to the State Board that initially licensed the charter. See Cal. Educ. Code § 47607. It is unclear how Albarran and McMahon could conceivably provide Promise with any procedural protections relating to its charter, let alone deprive Promise of that charter.

Promise's alternative theory fares no better. Promise argues that its "extreme dependence" on its agreement with SJUSD gave rise to a protected property interest in its

17

ability to use SJUSD facilities. Opp. at 13.[7] If a contract obligated SJUSD to let Promise use its facilities (an issue the parties dispute), it was not a contract of "extreme dependence." DeBoer, 206 F.3d at 869. Promise's purported contract with SJUSD was not analogous to welfare benefits or an employment agreement—it could not fairly be "characterized as a civil right." San Bernardino Physicians' Servs. Med. Grp., 825 F.2d at 1409. Although Albarran and McMahon may have been able to deprive Promise of its ability to use SJUSD's facilities, a property interest arising from extreme dependence simply requires more. And even if, in some circumstances, a charter school could show "extreme dependence" on a contractual right to school facilities, Promise has not explained why Albarran and McMahon as individuals, rather than SJUSD, violated Promise's due process rights.

More generally, Promise's due process claim is difficult to comprehend. Nowhere does Promise specify what process Albarran and McMahon should have provided Promise in their individual capacities, above and beyond the remedies available to Promise under California law. See Amend. Compl. ¶ 68; Opp. at 12–13. And a breach of contract action or Proposition 39's protections likely provide enough procedural protections to satisfy the Due Process Clause. See Today's Fresh Start, Inc. v. Los Angeles Cnty. Office of Educ., 303 P.3d 1140, 1162 (Cal. 2013) (holding that the procedural protections for charter revocations under Proposition 39 and its implementing regulations "comport with due process").

Therefore, the Court grants Defendants' motion to the extent Defendants seek to dismiss Promise's § 1983 due process claim. The Court grants Promise leave to amend to cure the above-described deficiencies.

### B. State Law Claims

The Court denies the motion to dismiss to the extent Defendants seek to dismiss Promise's California claims.

---

[7] Promise does not argue that "the contract itself contains a provision that the governmental entity can terminate the contract only for cause." DeBoer, 206 F.3d at 869.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Promise's § 1983 claims and DENIES Defendants' motion to dismiss Promise's state law claims. The Court gives Promise leave to amend Promise's § 1983 claims. Promise may file another amended complaint within 30 days of the date of this order.

**IT IS SO ORDERED.**

Dated: March 10, 2021



CHARLES R. BREYER
United States District Judge